**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 21 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MIDDLE RIO GRANDE
CONSERVANCY DISTRICT, a
political subdivision of the State of
New Mexico; THE STATE OF NEW
MEXICO *ex rel.* THE OFFICE OF
THE STATE ENGINEER; NEW
MEXICO INTERSTATE STREAM
COMMISSION; ATTORNEY
GENERAL FOR THE STATE OF
NEW MEXICO; FOREST
GUARDIANS, a non-profit New
Mexico corporation; DEFENDERS OF
WILDLIFE, a non-profit Washington,
D.C. corporation; SOUTHWEST
ENVIRONMENTAL CENTER, a non-
profit New Mexico corporation,

      Plaintiffs-Appellees,

CITY OF SOCORRO,

      Plaintiff-Intervenor-
      Appellee,

v.

GALE NORTON, Secretary of the
United States Department of the
Interior; UNITED STATES FISH
AND WILDLIFE SERVICE, an
Agency of the United States
Department of the Interior;
MARSHALL JONES, Acting Director,
United States Fish and Wildlife

Nos. 01-2057 and 01-2145

Service; NANCY KAUFMAN,
Southwest Regional Director, United
States Fish and Wildlife Service,

Defendants-Appellants.

- - - - - - - - - - - - - - - - - -

NEW MEXICO FARM AND
LIVESTOCK BUREAU,

Intervenor.

- - - - - - - - - - - - - - - - - -

ALBUQUERQUE METROPOLITAN
ARROYO FLOOD CONTROL
AUTHORITY,

Amicus Curiae.

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. Nos. CIV-99-870-M, CIV-99-872-M, CIV-99-1445-M)**

---

Charles T. DuMars of Law & Resource Planning Associates, P.C., Albuquerque, New Mexico, (Christina Bruff DuMars of Law & Resource Planning Associates, P.C., Albuquerque, New Mexico, for Plaintiff-Appellee Middle Rio Grande Conservancy District; Jerry A. Armijo, of the Law Offices of Jerry A. Armijo, Socorro, New Mexico, for Plaintiff-Intervenor-Appellee City of Socorro; Lee E. Peters of Hubert & Hernandez, P.A., Las Cruces, New Mexico, for Intervenor New Mexico Farm and Livestock Bureau, with him on the brief), for Plaintiff-Appellee Middle Rio Grande Conservancy District, Plaintiff-Intervenor-Appellee City of Socorro, and Intervenor New Mexico Farm and Livestock Bureau.

Karen L. Fisher, Special Assistant Attorney General, State of New Mexico, Santa Fe, New Mexico, (John Stroud, Special Assistant Attorney General, State of New

Mexico, Santa Fe, New Mexico, for Plaintiffs-Appellees The State of New Mexico *ex rel.* The Office of the State Engineer and the New Mexico Interstate Stream Commission; Patricia A. Madrid, Attorney General and Stephen R. Farris, Assistant Attorney General, Santa Fe, New Mexico, for Plaintiff-Appellee The New Mexico Attorney General, with her on the brief), for Plaintiffs-Appellees The State of New Mexico, *ex rel.* The Office of the State Engineer, The New Mexico Interstate Stream Commission and the New Mexico Attorney General.

Matt Kenna of Kenna & Hickcox, P.C., Durango, Colorado, for Plaintiffs-Appellees Forest Guardians, Defenders of Wildlife, and Southwest Environmental Center.

Susan Pacholski, Attorney, Environment and Natural Resources Division, U.S. Department of Justice, Washington, D.C., (John C. Cruden, Acting Assistant Attorney General, Washington, D.C.; Ellen J. Durkee and Andrew A. Smith, Attorneys, Environment and Natural Resources Division, U.S. Department of Justice, Washington, D.C., with her on the briefs), for Defendants-Appellants.

Maria O'Brien of Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, New Mexico, filed an Amicus Curiae brief for Albuquerque Metropolitan Arroyo Flood Control Authority.

---

Before **SEYMOUR**, **McKAY**, and **MURPHY**, Circuit Judges.

---

**MURPHY,** Circuit Judge.

---

## I. INTRODUCTION

Appellants are Gale Norton, Secretary of the Interior, the United States Fish and Wildlife Service (FWS), and FWS officials.  They appeal the district court's decision ordering FWS to prepare an environmental impact statement

(EIS) and issue a critical habitat designation for the Rio Grande Silvery Minnow within 120 days. This court has jurisdiction under 28 U.S.C. § 1291 and **affirms**.

## II. BACKGROUND

This appeal arises from FWS efforts to designate part of the Middle Rio Grande as critical habitat for the Rio Grande Silvery Minnow. The Silvery Minnow is a "stout silvery fish with emerald reflections reaching lengths of up to 3½ inches." *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1181 (10th Cir. 1999). The Minnow was once common in several western rivers including the Rio Grande and the Pecos. *See* Final Rule to List the Rio Grande Silvery Minnow as an Endangered Species, 59 Fed. Reg. 36,988, 36,988 (July 20, 1994) [hereinafter Silvery Minnow Listing]. Due to damming of these rivers and accompanying water diversion, the Silvery Minnow is confined now to a short stretch of the Rio Grande representing five percent of its historic range. *See Forest Guardians*, 174 F.3d at 1181. The minnow was listed as an endangered species in July 1994. *See* Silvery Minnow Listing, 59 Fed. Reg. at 36,988.

The Endangered Species Act (ESA) requires the Secretary of the Interior to designate critical habitat of an endangered species concurrently with a determination that the species is endangered. *See* Endangered Species Act, 16 U.S.C. § 1533(a)(3)(A). Critical habitat is area inside and outside the geographical range of the species that is "essential to the conservation of the

-4-

species." *Id.* § 1532(5)(A). Pursuant to 16 U.S.C. § 1533(b)(6)(C), FWS did not designate critical habitat at the time of listing but gave itself until March 1, 1995. *See Forest Guardians*, 174 F.3d at 1186. Even with the extension, FWS did not issue a designation until July 1999, a few months after this court ordered it to do so. *See id.* at 1193; Final Designation of Critical Habitat for the Rio Grande Silvery Minnow, 64 Fed. Reg. 36,274 (July 6, 1999) [hereinafter Final Designation], *as corrected*, 64 Fed. Reg. 39,560 (July 22, 1999).[1]

The designation consisted of 163 miles of the mainstem Rio Grande in New Mexico from Cochiti Dam in the north to Elephant Butte Reservoir in the south. *See* Final Designation, 64 Fed. Reg. at 36,274. This portion of the Rio Grande is known as the Middle Rio Grande and is divided into four reaches separated by diversion dams: Cochiti, Angostura, Isleta, and San Acacia. As of 1999, approximately seventy percent of the Silvery Minnow population lived in the southernmost reach, San Acacia.[2] Due to channelization, accompanying changes

[1] The delay is explained in part by congressional appropriations inadequate to fund all of FWS' statutory duties under the ESA. *See generally Forest Guardians v. Babbitt*, 174 F.3d 1178, 1183-84 (10th Cir. 1999). In response to the budget cuts, FWS established a thee-tier priority system to determine which duties it would pursue. *See id.* at 1183. Designating critical habitat occupied the lowest rung in the system. *See id.* Nevertheless, this court concluded in *Forest Guardians* that FWS' budgetary problems did not excuse it from designating critical habitat in accordance with the timeline established by the ESA. *See id.* at 1192-93.

[2] Currently, ninety-five percent of the Minnow population lives in the San Acacia reach. *See* Designation of Critical Habitat for the Rio Grande Silvery

to the river's speed and temperature, and introduction of nonnative fishes, very few minnows live in the Cochiti reach. Deprived of water by diversion dams, the Isleta reach also supports relatively few minnows.

Numerous parties challenged the Final Designation, arguing, among other things, that the designation did not comply with the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370d. NEPA's purpose is to ensure that federal agencies fully consider the environmental ramifications of their actions. *See Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1034 (10th Cir. 2001). To this end, NEPA requires that a "detailed statement . . . on . . . the environmental impact of the proposed action" be made before an agency undertakes a "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This detailed statement is labeled an Environmental Impact Statement, or EIS. *See* 40 C.F.R. § 1508.11 (2002). Before conducting the lengthy and expensive investigation necessary to issue an EIS, federal agencies frequently conduct an Environmental Assessment (EA), a preliminary step to determine if the proposed action requires an EIS, i.e., whether the action is one that may significantly affect the quality of the human environment. *See id.* § 1501.4(b), (c). The EA is intended to be a concise

---

Minnow, 67 Fed. Reg. 39,206, 39,208 (proposed June 6, 2002) (to be codified at 50 C.F.R. pt. 17) [hereinafter New Proposed Designation].

summary of the agency's analysis of whether the proposed action could result in significant impacts. *See id.* § 1508.9. If the EA results in a finding of possible significant impacts, NEPA requires preparation of an EIS. *See Airport Neighbors Alliance, Inc. v. United States*, 90 F.3d 426, 429 (10th Cir. 1996). If the agency instead makes a finding of no significant impacts (FONSI), an EIS is not required. *See* 40 C.F.R. § 1508.13.

In this case, FWS conducted an EA and concluded that the July 1999 critical habitat designation would not result in significant impacts on the human environment. It therefore issued a FONSI and did not conduct an EIS. The State of New Mexico, the City of Socorro, and the Middle Rio Grande Conservancy District argued to the district court that the EA failed to consider all the possible impacts of the designation, ignored data, and did not consider alternative designations.

The district court ruled that the FWS decision to forego an EIS was contrary to this circuit's caselaw. It concluded that the "circumstances in the Tenth Circuit which would relieve the Secretary of the Interior from the duty to prepare an EIS when designating critical habitat will be unquestionably rare. *Catron County Board of Commissioners v. United States Fish and Wildlife Service* [75 F.3d 1429 (10th Cir. 1996)]. The present case does not at this point present that rare exception." The district court ordered FWS to conduct an EIS

-7-

and propose a new critical habitat designation within 120 days of the order.[3]

FWS proposed a new critical habitat designation on June 6, 2002. *See Designation of Critical Habitat for the Rio Grande Silvery Minnow*, 67 Fed. Reg. 39,206 (proposed June 6, 2002) (to be codified at 50 C.F.R. pt. 17) [hereinafter New Proposed Designation]. It has not yet conducted an EIS. The government appeals the EIS requirement and the district court's refusal under Rules 60(b)(6) and 62(c) of the Federal Rules of Civil Procedure to modify the injunction to extend the 120 day deadline.[4]

## III. STANDARD OF REVIEW

FWS has not appealed the district court's decision that the EA/FONSI was arbitrary and capricious. Rather, FWS appeals the district court's injunction requiring it to conduct an EIS without first allowing FWS to reconsider whether an EIS is necessary. We review such an injunction for an abuse of discretion. *See Ross v. Fed. Highway Admin.*, 162 F.3d 1046, 1054 (10th Cir. 1998).

---

[3] The district court also ruled that the final rule designating critical habitat was arbitrary and capricious and violated the ESA's requirement that FWS consider the economic impacts of any proposed designation. It therefore set aside the designation and enjoined FWS from enforcing it. The district court, however, left the designation in place for 120 days, during which time FWS was ordered to propose a new designation and conduct an EIS.

[4] Now that FWS has proposed a new critical habitat designation, its appeal of the 120 day deadline to propose a new designation is moot. FWS' appeal of the 120 day deadline to conduct an EIS, however, is still before this court.

A district court should grant relief from judgment under Rule 60(b)(6) only "when it offends justice to deny such relief." *Yapp v. Excel Corp.*, 186 F.3d 1222, 1232 (10th Cir. 1999) (quotation omitted). We review the district court's decision for abuse of discretion and will reverse the denial of a 60(b)(6) motion "only if we find a complete absence of a reasonable basis and are *certain . . . that the decision is wrong.*" *Id.* (emphasis added, quotation omitted). We similarly review a decision under Rule 62(c) for abuse of discretion. *See* Fed. R. Civ. P. 62(c).

## IV. MANDATING PREPARATION OF AN EIS

It is well-settled that the judiciary's role in the NEPA context is merely to ensure that the federal agency takes a hard look at the environmental consequences of its actions. *See Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976). The initial decision as to the necessity of an EIS is the agency's, not a reviewing court's. *See Airport Neighbors Alliance*, 90 F.3d at 429. Accordingly, a reviewing court normally remands when it finds an agency's decision not to conduct an EIS arbitrary or capricious. In rare circumstances, however, a remand is not appropriate. In *Sierra Club v. Hodel*, this court observed:

> If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, *except in rare circumstances*, is to remand to the agency for additional investigation or explanation.

848 F.2d 1068, 1093 (10th Cir. 1988) (emphasis added, quotation omitted), *overruled on other grounds*, *Vill. of Los Ranchos de Albuquerque v. Marsh*, 956 F.2d 970, 972 (10th Cir. 1992) (en banc). Because FWS' delayed and inadequate compliance with NEPA and the ESA have helped to push the Silvery Minnow perilously close to extinction, and because the record contains overwhelming evidence of the environmental impacts of a critical habitat designation, this case represents one of the rare circumstances when a remand to the agency to conduct yet another EA is not appropriate.

FWS' compliance with NEPA and the ESA has been marked by massive delays and inadequate decision-making. Although the Silvery Minnow was listed as endangered in 1994, FWS did not designate critical habitat until this court ordered it to do so in 1999, four years after the 1995 deadline. *See Forest Guardians*, 174 F.3d at 1193. As this court noted in *New Mexico Cattle Growers Ass'n v. United States Fish & Wildlife Service*, such delay by FWS is not uncommon. *See* 248 F.3d 1277, 1283 (10th Cir. 2001). The critical habitat designation finally issued was denounced in the strongest terms by the district court:

> [FWS has] failed to consider important aspects of the problem before them, were predisposed to their conclusions without a thorough examination of the facts or situation presented, in the designation of critical habitat for the silvery minnow have neglected to follow NEPA and ESA requirements, and have put forward a grossly inadequate explanation of their decision to designate the whole of the

> Middle Rio Grande as critical habitat . . . . The latter has only
> minimal factual and rational support in the record and [] fails to
> accord with what the Endangered Species Act intends or requires.
> The final rule must therefore be set aside.

FWS has not appealed the district court's decision setting aside the designation as arbitrary or capricious. FWS also failed its mandate under NEPA to determine if the designation would significantly affect the human environment. As the district court stated, "[t]he finding of no significant impact contained in the [EA] does not represent a reasoned judgment." FWS likewise does not contest this conclusion on appeal.

These delays and irrational decisions come at the expense of the Silvery Minnow, officially endangered for nearly eight years. As FWS recognizes, damming, channelization, and the introduction of nonnative predatory fish have decimated the Silvery Minnow population. The Minnow currently occupies only five percent of its historic range. *See* Final Designation, 64 Fed. Reg. at 36,275. The species could be exterminated by a "single naturally occurring chance event." *Id.* In 1996, when extreme drought conditions reduced the predicted Rio Grande flow to seventeen percent of normal, thirty percent of the entire population may have been lost. In an emergency measure, a large number of minnows trapped in isolated pools were moved upstream by tanker truck. It is clear that to fulfill the ESA's goal of halting and reversing the Silvery Minnow's decline, no matter the

-11-

cost, FWS should designate critical habitat as soon as possible. *Cf. Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978).

Furthermore, there is overwhelming evidence that the designation will significantly affect the quality of the human environment, requiring preparation of an EIS. The effects of the designation are two-fold: first, it will require pervasive changes in the distribution of Middle Rio Grande riverwater resulting in the reduction of irrigated agriculture acreage; second, it may require the curtailment of river maintenance activities resulting in decreased water transport efficiency and an increased risk of flooding.

The entire designation is Rio Grande riverbed which contains, or is capable of containing, three "[p]rimary constituent elements." Final Designation, 64 Fed. Reg. at 36,279. These elements are:

> Stream morphology that supplies sufficient flowing water to provide food and cover needed to sustain all life stages of the species;
> Water of sufficient quality to prevent water stagnation (elevated temperatures, decreased oxygen, carbon dioxide buildup, etc.); and
> Water of sufficient quality to prevent formation of isolated pools that restrict fish movement, foster increased predation by birds and aquatic predators, and congregate pathogens.[5]

---

[5] The third constituent element previously read "Water quantity" instead of "Water of sufficient quality." *See* Rule to List the Rio Grande Silvery Minnow as Endangered, with Critical Habitat, 58 Fed. Reg. 11,821, 11,825 (proposed Mar. 1, 1993).

*Id.* The portion of the Rio Grande designated as critical habitat is heavily dammed and diverted, and the riverbed is often completely dry. Under current water management, isolated pools often form. The EA recognizes this in describing the Isleta reach of the Middle Rio Grande: "[m]any extensive portions of [Isleta] reach . . . are frequently isolated during summer and autumn months and eventually dry." San Acacia reach has more severe desiccation problems because of a lack of facilities returning diverted water back to the main channel. In dry years, the thirty-eight-mile stretch immediately below San Acacia Diversion Dam may be dry for two months or more.

The federal agencies charged with management of Rio Grande water are prohibited from taking or authorizing any action which diminishes the value of critical habitat for the survival or recovery of the Silvery Minnow. *See* 16 U.S.C. § 1536(a)(2) (requiring federal agencies to avoid any actions, or authorizing any actions, which destroy or adversely modify critical habitat); 50 C.F.R. § 402.02 (defining adverse modification to be any action which diminishes the value of critical habitat for the survival or recovery of the species). Consequently, federal agencies are prohibited from taking or authorizing any action which deprives critical habitat of its primary constituent elements, those physical and biological features essential to the conservation of the species. *See* 50 C.F.R. § 402.02 (including adverse modification of constituent elements in definition of adverse

modification of critical habitat).  Because extensive reaches of the Middle Rio

Grande are dry under current water management practices and do not contain

"[w]ater of sufficient quality to prevent formation of isolated pools," the

designation will require the federal water managers to reallocate water for the

Minnow's use.  The draft Economic Analysis,[6] relied upon by FWS in conducting

the EA, recognized that a primary effect of the designation would be to reduce the

expenditure of federal funds used to make water available for municipal and

agricultural uses.  The Silvery Minnow Recovery Plan[7] recognizes that up to 200

cubic feet per second of water must be released into the San Acacia reach to

maintain flowing water to provide suitable habitat.  One commentator estimated

that to provide that amount of water could require an additional 26,000 acre-feet

of water per year.  Other commentators to the Economic Analysis and the EA

---

[6] The ESA mandates that FWS "tak[e] into consideration the economic impact . . . of specifying any particular area as critical habitat" when formulating a critical habitat designation.  16 U.S.C. § 1533(b)(2).  This requirement is independent of, and in addition to, the analysis of other impacts as required by NEPA.  FWS complies with § 1533(b)(2) by conducting an "Economic Analysis." *See generally N.M. Cattle Growers Ass'n v. United States Fish & Wildlife Serv.*, 248 F.3d 1277, 1280, 1282-84 (10th Cir. 2001).

[7] The ESA requires FWS to develop Recovery Plans for every endangered species.  *See* 16 U.S.C. § 1533(f)(1).  The plans incorporate a description of "management actions" necessary for "conservation and survival of the species," measurable criteria for recovery of the species and removal from the endangered species list, and estimates of the time and cost necessary to achieve recovery of the species.  *See id.* § 1533(f)(1)(B)(i) - (iii).

indicated that the designation may require anywhere from 35,000 to 188,000 acre-feet of additional water per year, depending on weather conditions.

The Middle Rio Grande is fully appropriated. Any reallocation of water will be at the expense of water users. The draft Economic Analysis and comments submitted to FWS indicated that a change in water management practices would result in a substantial reduction of irrigated farmland acreage. The estimates range from 2,000 acres to 85,000 acres.

A loss of irrigated agriculture is not the only possible effect of the designation. In response to a questionnaire from FWS, the United States Bureau of Reclamation ("Reclamation") indicated it might curtail river management practices in response to the designation. Reclamation needs heavy machinery to perform the numerous tasks necessary to ensure swift water delivery and flood prevention. Reclamation indicated in its response to FWS that some of its activities might alter or damage Silvery Minnow habitat even if no individual species member was harmed. Thus, the designation may require Reclamation to adopt different design and construction techniques which may increase costs by as much as forty percent. Because Reclamation's budget may remain stable or decrease, the adoption of habitat-friendly maintenance techniques could result in the decrease of overall maintenance services. Reclamation estimated that the costs of such a curtailment of maintenance activities include reduced water

transport efficiency and a heightened risk of failure of water transport systems and flood protections. The Economic Analysis relied upon by FWS conceded that Reclamation's curtailment of maintenance activities and corresponding water transport inefficiency could result in a loss of 5,800 acre-feet of water every year and would reduce flood protection. Commentators to the Economic Analysis and the EA emphasized the potential costs of more numerous flooding events. While FWS discounted in the EA the possibility of reduced maintenance activities, it recognized earlier in the Silvery Minnow Recovery Plan that current river maintenance practices have degraded the quality of Silvery Minnow habitat.[8]

The evidence in the record thus demonstrates that the designation will result in a reallocation of water back into the riverbed and could result in a curtailment of river maintenance operations. The effects of these impacts, the loss of irrigated farmland and increased risk of flooding, however, only require preparation of an EIS if they significantly affect the quality of the human environment. *See* 42 U.S.C. § 4332(2)(C). Human environment should be "interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment." 40 C.F.R. § 1508.14. Significance is determined by looking at both the context of the action and its

---

[8] FWS recognizes in the new proposed designation that an effect of the designation may be to "minimiz[e] [] work and vehicle use in the main river channel." New Proposed Designation, 67 Fed. Reg. at 39,227.

-16-

intensity. *Id.* § 1508.27.[9] "Effects" or impacts include "ecological, . . . aesthetic, historic, cultural, economic, social, or health" effects. *Id.* § 1508.8. Economic and social effects alone, however, do not require preparation of an EIS. *Id.* § 1508.14.

The evidence in the record conclusively demonstrates that the effects of water reallocation and curtailment of river maintenance are significant. The reallocation of water to maintain the critical habitat and the accompanying loss of farmland are controversial. *See id.* § 1508.27(b)(4) (requiring determinations of significance to take into account the degree to which the effects of the action will be "highly controversial"). Controversy in the NEPA context does not necessarily denote public opposition to a proposed action, but a substantial dispute as to the size, nature, or effect of the action. *See Wetlands Action Network v. United States Army Corps of Eng'rs*, 222 F.3d 1105, 1122 (9th Cir. 2000). The wide disparity in the estimates of water required for the designation, and the associated loss of farmland acreage, indicate that a substantial dispute exists as to the effect of the

---

[9] Consideration of context reflects the practical observation that "[s]ignificance varies with the setting of the proposed action." 40 C.F.R. § 1508.27(a). If, for example, the context of the action indicates the action is site-specific, significance depends on the "effects in the locale rather than in the world as a whole." *Id.* Intensity refers to "the severity of the impact," taking into account several factors. *Id.* § 1508.27(b). These factors include the effect on public health and safety, the unique characteristics of the geographic area such as proximity to prime farmlands, and the extent to which the effects will be "highly controversial." *Id.*

designation. Moreover, the context of the designation is such that its effects will be felt locally in the Middle Rio Grande valley. *See* 40 C.F.R. § 1508.27(a). Given the aesthetic, economic, ecological, and cultural value of agriculture to the region, even a loss of 2,000 acres of irrigated farmland is significant. Furthermore, the possible failure of flood protections presents a danger to public health and safety and thus is significant. *See id.* § 1508.27(b)(2) (requiring determinations of significance to take into account the degree to which the action will affect public safety or health).

FWS argues that notwithstanding the overwhelming evidence of environmental impacts associated with the previous critical habitat designation, the district court required it to propose a new designation, which may differ radically in scope and have fewer impacts on the human environment. FWS contends that it should be given another opportunity to determine in the first instance whether an EIS is needed for the new designation. We disagree.

Now that FWS has proposed a designation broader than the previous designation, its argument loses much of its force. The new proposed critical habitat designation contains the four reaches of the previous designation but adds a portion of the Lower Jemez River, a tributary of the Rio Grande joining the mainstem just south of Angostura Diversion Dam. *See* New Proposed Designation, 67 Fed. Reg. at 39,234. Just as the previous designation would

result in significant environmental impacts, the broader proposed designation would as well.

Even if we review the district court's decision at the time it was made and ignore the new designation, FWS' argument is not persuasive. The district court could have concluded that any new critical habitat designation would contain the San Acacia reach of the Middle Rio Grande and therefore result in significant environmental impacts. A designation must include the geographical areas *occupied by the species* which contain features essential to the conservation of the species. *See* 16 U.S.C. § 1532(5)(A); 50 C.F.R. § 424.02(d)(1). Conservation is defined by the ESA as "the use of all methods . . . which are necessary to bring any endangered species . . . to the point at which" the protections of the ESA are no longer needed, i.e., recovery. 16 U.S.C. § 1532(3). Since upwards of seventy percent of the Silvery Minnow population[10] live in the San Acacia reach, the survival of the species would be threatened if the reach did not receive the special protections that come with designation as critical habitat. If the reach is necessary for the survival of the species, it also contains features necessary for the recovery of the species and must be included in any critical habitat designation. *Cf. Sierra Club v. United States Fish & Wildlife Serv.*, 245 F.3d 434,

---

[10] The new proposed critical habitat designation states that ninety-five percent of the Silvery Minnow population now resides in the San Acacia reach. *See* New Proposed Designation, 67 Fed. Reg. at 39,208.

-19-

442 n.50 (5th Cir. 2001) (noting that "survival is a necessary condition for recovery"); *see also* 16 U.S.C. § 1533(b)(2) (requiring FWS to designate area as critical habitat if a failure to designate the area would result in the species' extinction).[11]

As discussed, the San Acacia reach has the most persistent desiccation problems of any of the four reaches of the Middle Rio Grande. The Silvery Minnow recovery plan recognizes that 200 cubic feet per second of water needs to be reallocated to the San Acacia reach to provide suitable habitat for the Minnow. According to some estimates, this may require 26,000 acre-feet of water to be taken away from agricultural uses, resulting in a significant reduction in irrigated agriculture acreage. Moreover, Reclamation may be precluded from conducting river maintenance activities in the reach. The associated water loss and risk of flood protection failure significantly affect the human environment and mandate preparation of an EIS.

This court has recognized that the requirements of NEPA can further the objectives of the Endangered Species Act. *See Catron County*, 75 F.3d at 1436. This case demonstrates that the abdication of an agency's responsibilities under

---

[11] We note that the new proposed critical habitat designation concludes that the San Acacia reach does contain features essential to the conservation of the species, and the reach is included in the proposed designation. *See* New Proposed Designation, 67 Fed. Reg. at 39,223.

NEPA can frustrate the goals of the Endangered Species Act. FWS' delays and inadequate decisionmaking have resulted in the absence of a critical habitat designation eight years after the Silvery Minnow's listing. The protections of a designation are particularly needed by the Silvery Minnow, a species placed on the brink of extinction by habitat loss. Adherence to the policy objective of the ESA to halt the extinction of the minnow no matter the cost requires that NEPA compliance be completed as expeditiously, yet comprehensively, as possible. Allowing FWS the opportunity to conduct yet another EA, followed by an inevitable EIS, would not accomplish this. Our holding should not cast doubt on that general rule that the decision to conduct an EIS is committed to the administrative agency in the first instance. Given the *unique* circumstances of this case, however, the massive delays, the precarious position of the Silvery Minnow, and the overwhelming evidence of significant environmental impacts regardless of the size, shape, and location of the designation, the district court's order to conduct an EIS was not an abuse of discretion.[12]

## V. 120 DAY DEADLINE

---

[12] Of course, FWS need not conduct an EIS until it formally proposes a new critical habitat designation. *See Kleppe v. Sierra Club*, 427 U.S. 390, 401-02 (1976). FWS has now proposed a new designation, however, and it may proceed with the EIS.

With the March 21, 2001 deadline to finish the EIS and propose a new designation looming, FWS filed on March 19, 2001 a motion for an extension of time until September 28, 2002 to comply with the district court's order. The district court viewed the motion as a motion to modify the judgment under Rule 60(b)(6) of the Federal Rules of Civil Procedure or in the alternative as a motion to exercise its power to supervise compliance with the judgment entered.[13]

FWS argues that the district court ignored its detailed evidentiary proffer showing that compliance with a 120 day deadline was impossible given budgetary constraints. The district court specifically found, however, that the agency's difficulties in meeting the deadline stemmed from its delays in the past and were difficulties "of its own making." The remedy of modification pursuant to Rule 60(b) is extraordinary and should be granted only in exceptional circumstances. *See Bud Brooks Trucking, Inc. v. Bill Hodges Trucking Co.*, 909 F.2d 1437, 1440

---

[13] The district court did not specify in its April 25, 2001 denial of FWS' motion from what source it derived the power to supervise compliance with the judgment. FWS contends that the district court had such a power by virtue of Rule 62(c) of the Federal Rules of Civil Procedure. Rule 62(c) empowers a district court, in its discretion, to modify injunctions during the pendency of an appeal. This court has noted that Rule 62(c) and Rule 8(a) of the Federal Rules of Appellate Procedure authorize a district court to supervise a continuing course of conduct when the terms of the injunction require it to do so. *See Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824, 827 (10th Cir. 1993). Because the parties do not contest the applicability of Rule 62(c), we assume that the district court decided not to exercise its supervisory powers under both Rules 60(b)(6) and Rule 62(c).

(10th Cir. 1990).  The district court also has discretion to grant Rule 62(c) relief.  *See* Fed. R. Civ. P. 62(c).  Given the delays on the part of FWS and the urgent need for a new critical habitat designation, the district court did not abuse its discretion in denying Rule 60(b)(6) and Rule 62(c) relief.

## VI. CONCLUSION

The judgment of the District Court for the District of New Mexico is **affirmed**.