# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 22, 2011  Decided November 29, 2011
          Amended January 30, 2012

No. 10–5284

SIERRA CLUB, ET AL.,
APPELLEES

v.

ROBERT L. VAN ANTWERP, LIEUTENANT GENERAL, U.S.
ARMY CORP OF ENGINEERS, ET AL.,
APPELLEES

SIERRA PROPERTIES I, LLC, ET AL.,
APPELLANTS

———

Consolidated with 10–5297, 10–5345

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:07–cv–01756)

———

*Lane N. McFadden*, Attorney, U.S. Department of Justice, argued the cause for federal appellants. With him on the briefs was *Lisa E. Jones*, Attorney. *Jessica O'Donnell*,

Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney, entered appearances.

*Douglas M. Halsey*, *T. Neal McAliley*, and *Angela D. Daker* were on the briefs for appellants Sierra Properties I, LLC, et al.

*Eric R. Glitzenstein* argued the cause for appellees Sierra Club, et al. With him on the briefs was *Howard M. Crystal*.

Before: GARLAND and KAVANAUGH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: In 2007 the U.S. Army Corps of Engineers issued a permit authorizing the discharge of dredge and fill material into specified wetlands outside Tampa, Florida; it thereby enabled construction of a large mall. A number of firms are involved on the permittee's side in these appeals, but we will simplify by referring to them all, as well as the project, as "CCTC," standing for "Cypress Creek Town Center." Three environmental groups (collectively referred to as the "Sierra Club") brought suit in district court to challenge issuance of the permit. (The suit names the heads of the Department of the Interior and the U.S. Fish and Wildlife Service as well, but we treat the Corps as a stand-in for all federal defendants.) Plaintiffs invoked three statutes: the National Environmental Policy Act ("NEPA"), the Clean Water Act ("CWA"), and the Endangered Species Act ("ESA"). After some complications described below, the district court issued a decision finding that the Corps had not fully complied with its obligations under NEPA and the CWA, but rejecting the plaintiffs' ESA claim. It granted summary judgment for the Sierra Club on the first two claims

and for the Corps on the third. *Sierra Club v. Van Antwerp*, 719 F.Supp.2d 58 (D.D.C. 2010).

CCTC and the Corps appealed, and the Sierra Club cross-appealed. We affirm in part, reverse in part, and remand, concluding that the Corps did satisfy the demands of the three relevant statutes, except for failing to respond, in its treatment of the NEPA and ESA requirements, to a material contention as to the project's impact on an endangered species, the eastern indigo snake.

\* \* \*

Because CCTC proposed to discharge dredge and fill material into wetlands classified as "waters of the United States," it was required to secure a permit from the Corps under § 404 of the CWA, 33 U.S.C. § 1311(a), 1362(7). The Corps originally issued the permit in 2007, allowing CCTC to discharge such material into about 54 acres of wetlands. In exchange, the Corps required various conservation measures, including the preservation, creation, or enhancement of wetlands on about 13 acres of the project site and nearly 120 acres offsite. The Sierra Club filed suit in October 2007, but soon thereafter the Corps observed two unauthorized discharges of "sediments and turbid water" from the project site into nearby Cypress Creek, and accordingly suspended the permit. The district court granted the Corps's request to remand the case to it for a reevaluation of the permit. After issuing a new public notice, the Corps determined that the discharges were the product of "human error" rather than a flaw with the project itself. It reinstated the permit in September 2009, but required additional "corrective measures." The Sierra Club filed a revised complaint challenging the new permit. The district court granted split summary judgments as noted above.

4

As we review grants of summary judgment de novo, we are on this appeal in reality reviewing the decision of the Corps, not that of the district court. *Natural Resources Defense Council v. Daley*, 209 F.3d 747, 752 (D.C. Cir. 2000). Our review is governed by the usual standards of 5 U.S.C. § 706(2)(A) and *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29 (1983).

\* \* \*

*CWA*. The governing regulations bar the Corps from granting a CWA fill permit when "[t]here is a practicable alternative to the proposed discharge that would have less adverse effect on the aquatic ecosystem." 40 C.F.R. § 230.12(a)(3)(i). They specify that "[a]n alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). If (as here) a project's purpose does not require proximity to water, "practicable alternatives that do not involve special aquatic sites [such as wetlands, see *id*. § 230.41] are presumed to be available." *Id*. § 230.10(a)(3). The Sierra Club contended (and contends here) that in fact there were practicable alternatives—other sites, or alternative ways of using the CCTC site—having less adverse effect. The Corps rejected these claims. Resolution of the practicability issue turns on four subissues: (1) use of the site's fair market value as its cost, rather than CCTC's (lower) out-of-pocket cost; (2) failure on the Corps's part to update the fair market value in its second look at the permit (which took place after the onset of the global financial meltdown in 2008); (3) the Corps's use of 8% as the minimum rate of return necessary for an alternative to be considered practicable; and (4) CCTC's intention to provide more

parking per 1000 square feet of retail space than is provided on average, locally and indeed nationally.

For any given minimum rate of return, assumption of a lower cost for the site (see J.A. 613-36, 1660) will tend to render "practicable" less intensive uses, i.e., uses inflicting less ecological damage. This fact drives the Sierra Club's argument for acquisition cost, which in this case happened to be lower than fair market value. But the Sierra Club's contention that the regulation required the Corps to use the developer's acquisition cost is ill-founded.

First, as a matter of simple language, opportunity cost (the value the owner could realize by a current sale) is a well-recognized form of cost. This is obviously true in economics, and the practicability test, though certainly neither a cost-benefit test nor an efficiency test, nonetheless encompasses economic factors. And courts have recognized opportunity cost as a variant of "cost." Thus, the Supreme Court, in upholding the Federal Communications Commission's decision to set certain rates "on a forward-looking basis untied to [the providers'] investment," cited opportunity cost by way of analogy. *Verizon v. FCC*, 535 U.S. 467, 475, 499 n.17 (2002); see also *Natural Gas Clearinghouse v. FERC*, 108 F.3d 397, 400 (D.C. Cir. 1997). Second, the regulations' evaluation of alternatives requires consideration of cost on *both* sides of the comparison, and the cost of an alternative project site would presumably be that site's market value. The comparison would be meaningful only if the Corps used the same metric for all options. Third, 40 C.F.R. § 230.10(a)(2), in directing consideration of "cost," can sensibly (perhaps most sensibly, but we need not so decide) mean *the cost of proceeding* with the project as planned; for this, clearly, the relevant measure of the developer's land cost is what it foregoes by proceeding (rather than selling the land and realizing its market value). See Corps's Combined Reply

and Response Br. 6-7.  Fourth, whereas use of opportunity cost minimizes subjective, applicant-specific factors, reliance on the developer's acquisition cost would create the odd possibility that an alternative practicable for one applicant would be impracticable for another.  Finally (and this is really a variation of the fourth point), to use out-of-pocket cost would create an anomaly:  An applicant with a low acquisition cost could resell the site at market value and thereby enable a successor developer to refute practicability claims that had been fatal for the seller.  Accordingly, we have no difficulty whatever deferring to the Corps's reasonable choice to use the land's market value, rather than the developer's acquisition cost.

Peripheral to the acquisition-cost claim is the Sierra Club's attack on the Corps's failure to update the land's market value when it reinstated the permit in 2009, after land values had fallen sharply, especially in the so-called "sand" states, including Florida.  The Sierra Club notes that the Corps did update some plans and data, mostly related to the mitigation plan and stormwater management, and it thus claims an arbitrary inconsistency on the Corps's part.  But the Corps's decision to update ecological but not economic data appears reasonable in light of the Corps's reasons for reexamining the original permit.  As its December 2008 public notice explained, it suspended that permit because of unauthorized discharges of turbid water, and then undertook to decide whether to reinstate, modify, or revoke the permit, saying that its decision would "be based on an evaluation of the reassurances given to the Corps about the likelihood of future discharges of turbid water from the CCTC project site into Cypress Creek and wetlands on the site."  J.A. 1546-47.  Though the Corps also stated that it would "evaluate any other facts and issues as necessary," J.A. 1546, we see no basis in this for requiring it to restart its entire permitting analysis from zero.  Given the scope of the 2009 permit re-analysis, it

was reasonable for the Corps to update only the plans and data related to ecological matters.

The Sierra Club also attacks the Corps's acceptance of the applicant's contentions that an 8% rate of return was necessary to secure financing and that the planned project configuration was the only way to achieve that return. The Sierra Club claims that the record does not support use of an 8% rate; assumption of a lower required rate of return, of course, would tend to increase the range of practicable alternatives.

The CCTC submitted several reports, including one prepared by Ernst & Young, that examined the rates of return expected from comparable projects in the Tampa area. These reports produced estimates ranging from 7.6% to 10.06%. The Ernst & Young report concluded that a 7.6% return would be a "reasonable rate to expect" for the project when completed, but the project was subject to "a number of development risk factors" since it had not yet been completed. Joint Appendix ("J.A.") 1465. The report stressed the need for a "spread" between the rate of return on a project still under development and the rate of return on a "stabilized operating property." J.A. 1465. In addition, the record contained data indicating that Tampa regional malls had a "going-in capitalization rate" of 7.7%, with that term defined as "the first year NOI [net operating income] (before capital items of tenant improvements and leasing commissions and debt service but after real estate taxes) divided by present value (or purchase price)." J.A. 835. That of course suggests that it would be necessary to apply some non-trivial increment to the 7.6% or 7.7% estimates to make them suitable for calculating the minimum acceptable return on an as-yet unbuilt mall. We think the record plainly supports the Corps's use of an interest rate at the low end of the range that was in

evidence, and with its modest excess over the very lowest figures plainly justifiable.

The last of the practicability issues relates to the project's planned number of parking spaces—a serious matter because parking accounts for such a large share of the mall's surface. The Sierra Club argues that "CCTC would have more parking than any existing comparable mall in the Tampa area." Sierra Club Opening Br. 53. The record does not make it clear exactly how many parking spaces CCTC is expected to have, but gives a range of 5.13 to 6.59 parking spaces per 1,000 square feet of retail space, and the Sierra Club estimates the overall ratio as being 5.4. J.A. 572; Sierra Club Opening Br. 55. CCTC submitted various items of evidence on the point: On one hand it provided developer guidelines from Target, Costco, and Kohls that required 5, 5.5, and 6 spaces, respectively, per 1,000 square feet of retail space, and on the other, it also submitted letters from other Florida developers stating that retail tenants "typically" have "4.5 to 5" parking spaces per 1,000 square feet of retail space. J.A. 601, 604.

In fact both sides agree that CCTC's parking ratio exceeds that of nearby malls. But CCTC defends its above-average ratio by pointing to the above-average proportion of restaurants in its project. While the Sierra Club does not contest the restaurant-parking link, it argues that there is no reason for so many restaurants. CCTC, in turn, seeks to justify the high proportion by saying that it aims to create more than a traditional mall. Whereas traditional malls use 4.8% of their square footage for restaurants, "lifestyle centers" use 11.3%; CCTC, a self-described "town center," is between these two figures at 8.08%. Agency Record ("A.R.") 4605-06, 4663.

Given the nature of Sierra Club's arguments to the agency on this point, the Corps's acceptance of CCTC's parking ratio

was not arbitrary or capricious in light of the practicability regulations. Those require the Corps to evaluate the practicability of alternatives "in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). The regulations provide that "it will generally be assumed that appropriate economic evaluations have been completed, the proposal is economically viable, and is needed in the market place," 33 C.F.R. § 320.4(q), but they reserve to the agency an override power, saying that "the district engineer in appropriate cases, may make an independent review of the need for the project from the perspective of the overall public interest." *Id.* There appears to be little judicial interpretation of the process, but it has yielded one constraint that seems logically necessary: "[A]n applicant cannot define a project in order to preclude the existence of any alternative sites." *Sylvester v. U.S. Army Corps of Engineers*, 882 F.2d 407, 409 (9th Cir. 1989). There is nothing suggesting that CCTC's project definition falls below that benchmark, and the Sierra Club has not articulated any other, more binding constraint.

The Sierra Club observed in a letter to the Corps that even if "town center" malls feature more restaurants than traditional malls, that fact "does not clearly demonstrate that reduced parking is impracticable." We do not think this observation was enough to impose on the Corps the task of evaluating the practicability of non-"town center" alternatives. As it was, the Corps studied eleven alternative locations for the project and considered four alternative on-site configurations. J.A. 466-69, 1080-82. While the case does not require us to say the minimum burden a challenger must meet to trigger an additional study (and the concomitant examination of the project's "purpose"), the Sierra Club's remark was not enough. It did not even argue that this purely commercial project could achieve the 8% return required to obtain financing by shifting from a town center to a traditional mall. Accordingly, the Corps was not arbitrary (or in

violation of the CWA) in accepting CCTC's conception of the mall's design, including its relatively high proportion of restaurant space, and hence in finding that fewer parking spaces did not represent a practicable, less environmentally damaging, means to satisfy that purpose.

*NEPA*. NEPA requires that federal agencies prepare Environmental Impact Statements ("EISs") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). "If any significant environmental impacts might result from the proposed agency action then an EIS must be prepared before the [agency] action is taken." *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983) (emphasis omitted). An agency can avoid preparing an EIS if it issues a proper Finding of No Significant Impact ("FONSI"). In reviewing a FONSI our task is to determine whether the agency

> (1) has accurately identified the relevant environmental concern, (2) has taken a hard look at the problem in preparing its [FONSI or Environmental Assessment], (3) is able to make a convincing case for its finding of no significant impact, and (4) has shown that even if there is an impact of true significance, an EIS is unnecessary because changes or safeguards in the project sufficiently reduce the impact to a minimum.

*TOMAC v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006); see also 40 C.F.R. § 1501.4. Although our decisions have frequently (but not invariably—see, e.g., *Public Citizen v. Nat'l Highway Traffic Safety Admin.*, 848 F.2d 256, 267 (D.C. Cir. 1988)) repeated the phrase "convincing case" since its original appearance in *Maryland-National Capital Park and Planning Commission v. U.S. Postal Service*, 487 F.2d 1029, 1040 (D.C. Cir. 1973), our scope of review is in fact the usual one. *TOMAC* itself made this clear, introducing the four

numbered criteria with the standard language of judicial review of administrative action: "arbitrary, capricious, or an abuse of discretion." 433 F.3d at 861.

A regulation of the Council on Environmental Quality further explains: "*Significantly* as used in NEPA requires considerations of both context and intensity." 40 C.F.R. § 1508.27. It then proceeds to list ten factors that "should be considered in evaluating intensity." Although the district court focused on four of these factors and found they established that the project's environmental impact would be "significant," *Sierra Club*, 719 F. Supp. 2d at 66-67, the Sierra Club on appeal makes arguments only with respect to three. We first address the factors mentioned in subsections (b)(3) and (b)(10), finding the Corps's consideration adequate. As to subsection (b)(9), which relates to effects on endangered or threatened species, the Sierra Club's arguments here overlap with those it makes in the ESA context, and we defer discussion to our treatment of those claims.

Subsection (b)(3) refers to "[u]nique characteristics of the geographic area such as proximity to . . . wetlands." 40 C.F.R. § 1508.27(b)(3). Of course it was the project's impact on wetlands that required a permit from the Corps in the first place. But the Corps found that "[t]he wetlands are of moderate quality as they were logged and some of them were ditched" and that "[t]he wetlands are predominantly forested (cypress) and not unique or rare in the landscape." J.A. 1106. The district court observed that the Corps itself had found that wetlands provide "'valuable storage areas for storm and flood waters,'" *Sierra Club*, 719 F.Supp.2d at 66 (quoting J.A. 1107), but that does not in itself compel a finding that these particular wetlands are "unique" within the meaning of subsection (b)(3).

Moreover, apart from the wetlands' lack of uniqueness, the ultimate CCTC plan called for creation and preservation of substantial substitute wetlands, the sort of mitigation measures that we have found "sufficiently reduce the impact to a minimum." *Michigan Gambling Opposition v. Kempthorne*, 525 F.3d 23, 29 (D.C. Cir. 2008) (quoting *TOMAC*, 433 F.3d at 861), and that the Corps so found here. J.A. 1687. The Sierra Club argues that the Corps cannot rely on such mitigation, citing studies purporting to show that wetlands mitigation often fails, in large part because of the Corps's lax enforcement. But even assuming that general attacks on the Corps's monitoring of wetlands mitigation could ever justify its or our disregard of specific mitigation measures, here in fact the Corps verified that the measures were proceeding. J.A. 1494-1501, 1543, 1576, 1581-84. Moreover, its 2009 permit added special conditions in response to early setbacks. J.A. 1695.

Subsection (b)(10) directs attention to whether "the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment," and the Sierra Club argues that the unauthorized 2008 discharge of turbid water into Cypress Creek not merely threatened violations of those requirements but constituted such violations. The Corps found that this discharge was the result of "human error" and not a problem of design. J.A. 1672. The district court ruled that "NEPA regulations make no exception for human error" and that an EIS should have been prepared because the "2008 discharge did, in fact violat[e] Federal, State and local environmental law." *Sierra Club*, 719 F.Supp.2d at 67. But the subsection's reference to "threats" indicates that it is forward-looking. Given that the Corps required additional assurances from CCTC before reinstating the permit, J.A. 1682, 1696, it could reasonably find that a past violation did not "threaten" future violations.

*ESA (and leftover NEPA issues).* The Sierra Club also argues that the district court erred by upholding the Corps's determination that formal consultation under the ESA was not required. The ESA requires that federal agencies "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat." 16 U.S.C. § 1536(a)(2). Regulations promulgated under the ESA provide that "[e]ach Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat. If such a determination is made, formal consultation [with the Fish and Wildlife Service] is required." 50 C.F.R. § 402.14(a). The regulations create an exception to that obligation where, as a result of informal consultation, the "Federal agency determines with the written concurrence of the Director [of the Fish and Wildlife Service], that the proposed action is not likely to adversely affect any listed species or critical habitat." *Id*. at § 402.14(b). After issuing its first public notice in October 2005, the Corps engaged in informal consultation with the Fish and Wildlife Service ("FWS"). A.R. 3093; J.A. 536, 889. The FWS "concur[red] with the [Corps's] determination that the proposed project [was] not likely to adversely affect the wood stork nor any other species listed under the ESA." J.A. 893. Accordingly, the Corps did not undertake formal consultation; as a technical matter, it is the Corps's dispensing with formal consultation to which the Sierra Club objects.

The Sierra Club argues that the Corps's determination was erroneous because the project may have adverse effects on habitat used by both the indigo snake and wood stork. In parallel with its ESA contention, the Sierra Club raises a NEPA argument, pointing to 40 C.F.R. § 1508.27(b)(9), under which an adverse effect on "an endangered or threatened species or its habitat" is an indication of "intensity" and thus

tends to militate in favor of finding "significance" and of requiring an EIS. In both ESA and NEPA contexts, we reject the Sierra Club's wood stork claim but find that the Corps failed to adequately address indications of an adverse effect on the indigo snake.

Of the two statutes, the ESA and NEPA, the ESA is (unsurprisingly) the more demanding on this point. Subject to the exception noted above, it requires the agency to engage in a formal consultation if it determines that the action in question "*may affect* listed species or critical habitat." 50 C.F.R. § 402.14(a) (emphasis added). NEPA triggers the EIS requirement only for "major Federal actions *significantly affecting* the quality of the human environment." 42 U.S.C. § 4332(C) (emphasis added). The four-part test for review of a FONSI that we quoted at the outset of the NEPA discussion explains that a project with a potentially significant impact will not require an EIS if "changes or safeguards . . . sufficiently reduce the impact." *TOMAC v. Norton*, 433 F.3d at 861. We see no reason why the general principle of taking mitigation into account should not apply to the decision whether the ESA requires formal consultation. Cf. *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1216-17, 1218-20 (9th Cir. 2004) (approving a biological assessment that relied on mitigation for its no-adverse effect finding).

As to the wood stork, the Corps's conclusions rested on the project's mitigation measures, which will bring about a net *gain* of wood stork foraging habitat. During informal consultation, the FWS determined that 16.22 acres of "potential wood stork habitat" existed on the site pre-construction and that with mitigation 21.35 acres would exist post-construction, resulting in a net gain. J.A. 1118. But the Sierra Club argues that the government did not "address *near term* adverse impacts on breeding colonies while off-site mitigation is being implemented." Sierra Club Opening Br.

15

81-82 (emphasis in original). The Corps's answer here was to rely on the mitigation plan's "more than a one-to-one replacement ratio to compensate for the temporal lag between the loss of a wetland's foraging value and when the new resource achieves that value." J.A. 905. We certainly cannot say that as a general matter a roughly 33% net quantitative gain in habitat offsets a non-trivial "temporal lag"; in an extreme case no members of the species would make it through to enjoy the replacement area. But here the FWS found that the lost habitat, although "within the core foraging areas [i.e., within 13 miles] of five wood stork breeding colonies," was not within the "primary or secondary zone" of any colonies. J.A. 890. Given the relatively marginal role of the lost habitat, it does not seem arbitrary or in contravention of its statutory mandate for the Corps to find that the mitigation's more than "one-to-one replacement ratio" made up for the temporary deprivation.

For the indigo snake, the Corps's 2007 mitigation plan concluded that "[i]nadequate habitat for maintenance of eastern indigo snakes exists on the impact site in its *predevelopment* state." J.A. 997 (emphasis added). But conservation guidelines submitted in CCTC's own application noted that the snake is "especially vulnerable" to habitat "fragmentation" because of the snake's large range. J.A. 164. Nevertheless, the Corps and FWS did not address the fragmentation risk. After the permit was suspended in 2008, the Corps's new public notice said that it would "reinitiate informal consultation with the [FWS] regarding the issues addressed in this public notice." J.A. 1547.

In this renewed proceeding, the Sierra Club submitted two declarations related to the eastern indigo snake. The first declarant, a local Sierra Club member, wrote that he had seen an eastern indigo snake on the project site in May 2007. J.A. 1295. The second declaration was from Dr. Kenneth Dodd, a

herpetologist who as Staff Herpetologist for the Office of Endangered Species in the FWS had been "primarily responsible for the listing of the" eastern indigo snake as threatened under the ESA. Dr. Dodd asserted that the project site was an important "wildlife corridor" linking protected areas to the north and south. J.A. 1317. He noted that "movements over large areas of fragmented habitats expose Eastern Indigo Snakes to increased road mortality," and that "the more edge there is in relation to protected habitat [i.e., ratio of perimeter to surface area], the less likely large snakes can be maintained." J.A. 1306. He claimed more broadly that the Corps had failed to consider how the project would adversely affect the snake through "fragmentation" of its "habitat in lands near the site as a result of impacts to the site and the wildlife corridor connecting these lands." J.A. 1317.

In its second FONSI, issued in August 2009, the Corps again did not address the impacts of habitat fragmentation. J.A. 1696-97. Given Dr. Dodd's expertise and experience, and the seeming logic of his analysis, as well as CCTC's own acknowledgment of the snake's vulnerability to fragmentation risk, we think his comment qualifies as the sort of "relevant and significant" public comment to which an agency must respond, lest its action be arbitrary and capricious. See *Cape Cod Hospital v. Sebelius*, 630 F.3d 203, 211 (D.C. Cir. 2011). Accordingly, we must remand for further explanation by the Corps of its determination that the project was "not likely to adversely affect" the indigo snake. We do not reach the issue of whether formal consultation is required, but the Corps must make some determination on the issue of habitat fragmentation, both for ESA and NEPA purposes.

\* \* \*

Our decision here of course substantially alters the substantive merits outcome that underlay the district court's injunction. Accordingly it will be suitable on remand for the court to entertain contentions relating to modification of that injunction.

In short, we reverse the district court entirely as to the CWA; reverse it as to NEPA except insofar as the court required further explanation by the Corps as to potential fragmentation of the indigo snake's habitat; and affirm its decision as to the ESA except in so far as it found the Corps's analysis of the indigo snake issue adequate.

The judgment of the district court is therefore

*Affirmed in part, reversed in part, and remanded.*